DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Dawn Schaber-Goa, | ) | |
| | ) | CASE NO. 3:03CV7524 |
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| Department of Rehabilitation and Correction, | ) | (Resolving Doc. No. 28) |
| Toledo Correctional Institution, | ) | |
| | ) | |
| Defendant(s). | ) | |

## I. INTRODUCTION

Plaintiff Dawn Schaber-Goa has asserted claims of hostile work environment sexual harassment and Title VII retaliation against Defendant Department of Rehabilitation and Correction, Toledo Correctional Institution (TCI). Before the Court is TCI's Motion for Summary Judgment on all of Schaber-Goa's claims (Doc. No. 28), which has been fully briefed (Doc. Nos. 43, 49.)  Because Schaber-Goa has not presented sufficient evidence that the work environment was objectively hostile, the Motion is GRANTED with respect to her hostile work environment sexual harassment claim. However, because Schaber-Goa has presented sufficient evidence of retaliation, the Motion is DENIED with respect to her Title VII retaliation claim.

(3:03CV7524)

## II. BACKGROUND

Plaintiff Dawn Schaber-Goa is a corrections officer at Defendant Department of Rehabilitation and Correction, Toledo Correctional Institution (TCI). On September 21 2001, she was assigned to special duty or fourth shift which required her to work from 7:20 a.m. until 3:30 p.m. LeSean Folmar was another corrections officer working at TCI in September of 2001. He had recently been promoted to Lieutenant, but the promotion did not become effective until 12:00 a.m. September 22, 2001. Schaber-Goa was aware of the promotion and testified that she considered Folmar both a corrections officer and a superior officer. On September 21, 2001, however, Folmar was working as a corrections officer and wearing the gray uniform of a corrections officer. (Schaber-Goa depo. p. 38.)

### A. The Incidents

Around 7:30 a.m. on September 21, 2001, Schaber-Goa was working at the visitor processing post. She was standing behind a desk/counter and behind a chair that was pushed into the desk. At that time, Folmar entered the post and pulled the chair away from the desk. As he was pulling the chair away from the desk, Folmar's pinkie finger poked Schaber-Goa in the crotch. Schaber-Goa jumped, and Folmar said "excuse me Goa, I need this chair." (Schaber-Goa depo, p. 47.) Schaber-Goa moved aside, and Folmar took the chair. Schaber-Goa's gut feeling was that Folmar had intentionally poked her, but she took his apology at face value. (Schaber-Goa depo. p. 57.) Consequently, she initially did not report this incident to anybody.

Later that same day, at approximately 2:30 p.m., Schaber-Goa was sitting at the processing desk/counter preparing to process visitors who were completing their visitation, Folmar was in the same

2

(3:03CV7524)

room sitting near lockers.  At some point, Folmar walked over to Schaber-Goa's desk/counter and

placed his raincoat on it.  Schaber-Goa informed Folmar that she needed his jacket off of the counter

and requested that he remove it.  Folmar, however, told her to "shut up" because he was talking.

(Schaber-Goa depo. p. 68.)  Schaber-Goa then pushed the jacket to the floor.  In response, Folmar

told Schaber-Goa to pick up his jacket, but she refused.  An argument ensued over who was going to

pick up the jacket.  Folmar then asked Officer Searle for an incident report, which prompted Schaber-

Goa to ask for one as well.  Officer Searle, however, did not have any blank incident reports.  After

learning that Officer Searle did not have any blank incident reports, Folmar again asked Schaber-Goa

to pick up his jacket.  Schaber-Goa indicated that she would pick up the jacket if Folmar would then

remove it from her desk, and Folmar agreed.  Officer Tomszak was walking past the desk/counter at

this point, and Schaber-Goa asked him to pick up the jacket, which he did.  Schaber-Goa then looked

at Folmar waiting for him to remove the jacket.  Folmar walked over, picked up his jacket, leaned over

the desk/counter, and grabbed Schaber-Goa's left breast saying "there Goa, put that in your incident

report, I just grabbed your tits." (Schaber-Goa depo. pp. 90-91.)  Folmar then walked away, and

Schaber-Goa began processing visitors who were coming through the building at that point.

After processing the visitors, Schaber-Goa went outside to have a cigarette.  At this time she

related what had just occurred to Officer Rymer.  She also realized that Folmar's poking her crotch

earlier in the day was intentional and related that incident to Officer Rymer as well (this was the first

time that she had told anyone about the crotch poking incident).  Officer Rymer told Schaber-Goa to

discuss the incidents with Captain Potts, her captain, and to report the incidents.  Schaber-Goa then

(3:03CV7524)

contacted Captain Potts and requested that they speak off the record.[1]  She related the incidents to

Captain Potts, and he told her to report the incidents.

### B. The Investigation

The next day, September 22, 2001, Schaber-Goa filled out two incident reports, one

describing the crotch touching incident and one describing the breast grabbing incident.  She submitted

them to Lieutenant LeSoya, who copied them and placed them on Captain Potts' desk.

On September 24, 2001, Schaber-Goa was called in on her day off to discuss the reports with

the personnel department.  She first met with Wendy Davis, the chairperson of TCI's EEO committee.

Davis then contacted Staci Freeman, the acting EEO investigator; briefly informed her of Schaber-

Goa's allegations; and sent Schaber-Goa to see Freeman.  Next, Schaber-Goa met with Freeman and

described again the incidents.  Freeman told Schaber-Goa that she would look into it.  (Schaber-Goa

depo. p. 105.)

On November 29, 2001, Freeman obtained an affidavit from Schaber-Goa and indicated that

she would begin the investigation into her allegations. (Schaber-Goa depo. p. 108.)  Freeman also

obtained the affidavits of Captain Potts, Officer Donald Dobbs, Officer Tomszak, and Patricia Soto on

November 29, 2001; Searle's affidavit on December 4, 2001, and the affidavits of Folmar and Davis

on December 6, 2001.  It is unclear at what point Freeman actually began her investigation.  Ultimately,

however, Freeman concluded that she could not substantiate Schaber-Goa's allegations, nor could she

---

[1]Schaber-Goa requested that the conversation be off the record so that Captain Potts would
not be obligated to report the incident. (Schaber-Goa depo. 109-11.)

(3:03CV7524)

disprove them.

### C. Alleged Retaliation

In October of 2001, Lieutenant Presberry met with Schaber-Goa regarding her final probation evaluation.  At this time, the evaluation stated that Schaber-Goa "meets" expectations in all categories. While reviewing the evaluations, however, Deputy Warden Jeffreys concluded that it "wasn't an accurate evaluation for her teamwork and cooperation." (Jeffreys depo. p. 37.)  As a result, he told Lieutenant Presberry to change Schaber-Goa's evaluation.  Consequently, Schaber-Goa's evaluation was downgraded so that it now rated her "below" expectations in the area of Team Work/Cooperation.  These evaluations are important because they "play a key element in promotions." (Jeffreys depo. p. 45.)  Deputy Warden Jeffreys claimed that his conclusion that Schaber-Goa was deficient in team work was based on Schaber-Goa's interactions with him and with other corrections officers and inmates. (Jeffreys depo. 41.)   Jeffreys, however, had no problem with Schaber-Goa and could not recall any corrections officers or inmates with whom she had problems.  (Jeffreys depo. 42-43.)  However, he was aware that Schaber-Goa's sexual harassment complaint was going on at the same time.  (Jeffreys depo. 43-44.)  Jeffreys also later acknowledged that, as a result of the incidents described in the sexual harassment complaint, Folmar was one of the corrections officers with whom Schaber-Goa did not get along. (Jeffreys Depo. p. 44.)

In 2001, Schaber-Goa also applied to be a member of TCI's hostage negotiation team.  While membership on the hostage negotiation team did not result in an increase in base pay, it did provide the opportunity for overtime pay resulting from the training, and membership on the team was considered

(3:03CV7524)

prestigious.  Schaber-Goa later learned that she had been selected for the second round of interviews.

On October 8, 2001, however, Warden Konteh removed Schaber-Goa's name from list of

interviewees.  Captain Harris told her that Warden Konteh had removed her name because of her "file

against Folmar" and that "this was just the beginning." (Schaber-Goa depo. p. 150.)

### D. Procedural History

Schaber-Goa initiated this action on September 9, 2003, alleging hostile workplace sexual

harassment and retaliation in violation of Title VII.  TCI has now moved for summary judgment, and

this issue has been fully briefed.

### III. LEGAL STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 .  When considering a

motion for summary judgment, "the inferences to be drawn from the underlying facts contained in

[affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the

light most favorable to the party opposing the motion."  U.S. v. Diebold, Inc., 369 U.S. 654, 655

(1962).  However, the adverse party "may not rest upon mere allegation or denials of his pleading, but

must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256 (1986).

The Rule requires the nonmoving party who has the burden of proof at trial to oppose a proper

summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the

mere pleadings themselves[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  General

(3:03CV7524)

averments or conclusory allegations of an affidavit do not create specific fact disputes for summary

judgment purposes.  See Lujan v. National Wildlife Federation, 497 U.S. 871, 888-89 (1990).  Nor

may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been

made, which contradicts . . . earlier deposition testimony."  Reid v. Sears Roebuck & Co., 790 F.2d

453, 460 (6th Cir. 1986) (citing Biechell v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir. 1984)); but

see Baer v. Chase, 392 F.3d 609, 623-26 (3d Cir. 2004) (noting that a so-called "sham" affidavit need

not be disregarded if there is "independent evidence in the record to bolster [the] otherwise

questionable affidavit").  Further, "'[t]he mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for

the plaintiff.'"  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1477 (6th Cir. 1989) (quoting Anderson

v. Liberty Lobby, 477 U.S. at 252).

      In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the

need for a trial – whether, in other words, there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either party."

Anderson v. Liberty Lobby, 477 U.S. at 250.  Put another way, this Court must determine "whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law."  Id. at 251-52.  See also Wexler v. White's Fine

Furniture, Inc., 317 F.3d 564, 578 (6th Cir. 2003) ("[t]he conflicting proof and the inferences that can

be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment").

## IV. DISCUSSION

7

(3:03CV7524)

## A. Hostile Work Environment Claim

To establish a Title VII claim of sexual discrimination based on hostile work environment sexual harassment, a plaintiff must establish five things:

(1) she is a member of a protected class,
(2) she was subjected to unwelcome sexual harassment,
(3) the harassment was based on her sex,
(4) the harassment created a hostile work environment, and that
(5) the employer is vicariously liable.

Clark v. United Parcel Serv., Inc., 400 F.3d 341, 347 (6th Cir. 2005) (citing Williams v. Gen. Motors Corp., 187 F.3d 553, 560-61 (6th Cir.1999)).  Here, TCI argues that Schaber-Goa cannot establish either that the harassment created a hostile work environment or that TCI is vicariously liable.

The first issue is whether Schaber-Goa has established that she was exposed to a hostile work environment.  "[T]o maintain a hostile work environment claim, the victimized employee must show that under the totality of the circumstances, the alleged conduct is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Id. at 351 (quoting Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993)).  The work environment must be both objectively and subjectively hostile.  Id. (citing Harris, 510 U.S. at 21-22).  The factors courts consider in determining whether a work environment is sufficiently hostile include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23, quoted in Clark, 400 F.3d at 351.

The alleged harassment must be more than a set of isolated or sporadic incidents, rather "the

8

(3:03CV7524)

plaintiff's allegations must depict conduct that could be construed as pervasive enough to alter the conditions of her employment and to create an abusive situation." <u>Clark</u>, 400 F.3d at 351.  While a single incident of harassment may be a sufficient basis for a claim of *quid pro quo* sexual harassment, in a hostile work environment action, "the plaintiff has the burden of demonstrating that 'injury resulted not from a single isolated or offensive incident, comment, or conduct, but from incidents, comments, or conduct that occurred with some frequency.'" <u>Highlander v. K.F.C. Nat'l Mgmt. Co.</u>, 805 F.2d 644, 650-51 (6th Cir. 1986) (quoting <u>Rabidue v. Osceola Refining Co.</u>, 805 F.2d 611, 620 (6th Cir.1986)).  Indeed, "[t]he harassment should be ongoing." <u>Clark</u>, 400 F.3d at 351.

Here, Schaber-Goa asserts that two incidents of harassment, the crotch touching incident and the breast grabbing incident, which occurred on the same day demonstrate a hostile work environment. Schaber-Goa does not contend that any other incidents contributed to the creation of a hostile work environment.  While these two incidents were clearly severe and the breast grabbing incident clearly physically threatening, they occurred during the course of one day and were situationally isolated.  The crotch touching incident occurred at the beginning of the day in a relatively calm setting; indeed, Schaber-Goa testified that she took Folmar's apology at face value.  The breast grabbing incident, conversely, occurred near the end of the day, during the course of an argument, and represented a blatant and intentional invasion of Schaber-Goa's personal space.  Considering the totality of these circumstances, the Court cannot conclude that the conduct here could be construed as sufficiently pervasive to alter the terms of employment.  The incidents did not occur in a context from which one could conclude that Schaber-Goa would likely experience such conduct in the future.  Thus, one could

9

(3:03CV7524)

not conclude that the terms of her employment were altered.

Schaber-Goa argues that these events are sufficiently severe to create a question of fact regarding whether her work environment was objectively hostile.  She argues that the lack of pervasiveness does not defeat her claims because "the 'severe or pervasive' requirement does not present two mutually exclusive evidentiary choices, but reflects a unitary concept where deficiencies in the strength of one factor may be made up by the strength in the other." McCormick v. Kmart Distribution Center, 163 F. Supp. 2d 807, 817 (N.D. Ohio 2001) (citing Hampel v. Food Ingredients Specialties, 729 N.E.2d 726, 736 (Ohio 2000)). While this sliding scale approach applies to hostile work environment claims, it does not absolve a plaintiff from presenting any evidence that harassing conduct was at least minimally pervasive.

Schaber-Goa, however, has not presented any evidence that the harassing conduct was pervasive.  She has provided no evidence that the crotch touching incident or the breast grabbing incident, or other amplifying conduct, were either on-going or occurred with any frequency. These two incidents alone, one which Schaber-Goa initially dismissed as an accident and another occurring during the course of an argument, do not establish that the conduct was sufficiently pervasive so as to alter the terms and conditions of Schaber-Goa's employment.  The work environment, therefore, was not objectively hostile.[2]

Schaber-Goa also argues that only one incident of harassment is sufficient to establish a hostile work environment if the harasser is a supervisor based on dicta in Brooks v. City of San Mateo, 229

---

[2]This is not to say that the Court does not find Folmar's alleged conduct egregious.

(3:03CV7524)

F.3d 917, 927 n.9 (9th Cir. 2000).  The parties dispute whether Folmar qualifies as Schaber-Goa's

supervisor.  Most courts have defined "supervisor" for Title VII purposes as "a person with immediate

or successively higher authority over the employee who exercises significant control over the

employee's hiring, firing, or conditions of employment."  Browne v. Signal Mount. Nursery, L.P., 286

F. Supp. 2d 904, 912 (E.D. Tenn. 2003) (collecting cases).  See also Stevens v. United States Postal

Serv., 21 Fed. Appx. 261, 263-64 (6th Cir. 2001) (holding harasser was a co-worker where

"[a]lthough [harasser] had informal supervisory duties, he did not have the formal title of supervisor nor

did he have the power to hire or fire [the plaintiff]"); McCormick, 163 F.Supp.2d at 821.  TCI had

promoted Folmar to Lietenant, but the promotion was not effective until midnight of the date on which

the alleged harassment occurred.  Folmar, therefore, did not have any actual authority to exercise

control over Schaber-Goa's hiring, firing, or conditions of employment.

     Schaber-Goa, however, contends that she believed Folmar to be a supervisor at the time of the

alleged harassment.  "If . . . it is alleged there is a false impression that the actor was a supervisor, when

he in fact was not, the victim's mistaken conclusion must be a reasonable one."  Burlington Indus. v.

Ellerth, 524 U.S. 742, 759 (1998).  Thus, an employer can be liable if the victim (1) actually had the

false impression that the actor was a supervisor and (2) the impression was reasonable.  The victim's

impression or conclusion, however, must be that the purported supervisor was "a person with

immediate or successively higher authority over the employee who exercises significant control over the

employee's hiring, firing, or conditions of employment."  See Browne, 286 F. Supp. 2d at 912

(collecting cases).  Thus, a victim's impression or conclusion that a promoted co-worker was a

11

(3:03CV7524)

supervisor is reasonable only if the promoted co-worker exercised, or gave the impression that he had the power to exercise, some supervisory authority.

Here, Schaber-Goa presents evidence that she was aware of Folmar's promotion and that, at the time of the incidents, she considered him to be both a co-worker and superior officer. Schaber-Goa, however, has presented no evidence that Folmar acted towards her in a supervisory capacity on the day in question. Furthermore, Folmar was wearing the uniform of a corrections officer, not a supervisor. Additionally, Schaber-Goa threw Folmar's coat to the ground. Thus, there is no evidence from which Schaber-Goa could have reasonably concluded that on the day in question Folmar was her supervisor. TCI had announced that it was promoting Folmar, but the promotion had not yet become effective. Folmar did not purport to exercise any supervisory authority on the day in question. Schaber-Goa, therefore, could not have reasonably believed that Folmar was her supervisor. Thus, the Brooks standard does not apply, and Schaber-Goa still must present some evidence of pervasiveness. As discussed above, however, Schaber-Goa has not presented any evidence of pervasiveness. Schaber-Goa, therefore, cannot establish a prima facie case of hostile environment sexual harassment, and TCI is entitled to summary judgment on that claim.[3]

## B. Retaliation Claim

---

[3]TCI also argues that Schaber-Goa cannot establish respondeat superior liability. While the Court agrees with TCI that Folmar was not Schaber-Goa's supervisor, the Court concludes that questions of fact remain regarding whether TCI "failed to implement prompt and appropriate corrective action." Clark, 400 F.3d at 348. While Folmar was assigned to a different shift immediately after the incident by virtue of his promotion, Schaber-Goa has presented evidence that the investigation of the incident did not commence until nearly two months later and that Folmar was later assigned to be her supervisor.

(3:03CV7524)

Next, the Court will consider Schaber-Goa's claim of unlawful retaliation.  Courts analyze Title VII retaliation claims pursuant to the burden shifting framework promulgated in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973).  <u>Abbott v. Crown Motor Co., Inc.</u>, 348 F.3d 537, 542 (6th Cir. 2003). Thus, to establish retaliation, the plaintiff must first establish a prima facie case of retaliation. <u>McDonnell Douglas</u>, 411 U.S. at 802. The burden then shifts to the defendant to provide a legitimate non-retaliatory reason for the adverse employment action. <u>Id.</u>  Once the defendant has met this burden, the plaintiff is then afforded the opportunity to prove that the defendant's stated reason is a pretext for unlawful retaliation. <u>Id.</u> at 804.

### 1. Prima facie case

To establish a prima facie case of Title VII retaliation, a plaintiff must show four things:

> (1) she engaged in an activity protected by Title VII, (2) the exercise of that protected right was known to [her employer], (3) the [employer] thereafter took an employment action adverse to [the plaintiff], or [she] was subjected to severe or pervasive retaliatory harassment by a supervisor, and (4) a causal connection existed between the protected activity and the adverse employment action or harassment.

<u>Akers v. Alvey</u>, 338 F.3d 491, 497 (6th Cir. 2003) (citing <u>Morris v. Oldham County Fiscal Court</u>, 201 F.3d 784, 792 (6th Cir.2000)).  TCI argues that Schaber-Goa cannot demonstrate (1) that she was subject to an adverse employment action or (2) that there is a causal connection between her protected activity and any purported adverse employment action.

### <u>*a. Adverse Employment Action*</u>

TCI argues that Schaber-Goa cannot establish that she was subject to an adverse employment action.  "An adverse employment action is a 'materially adverse change in the terms or conditions of . .

13

(3:03CV7524)

. employment because of [the] employer's conduct.'" Mitchell v. Vanderbilt Univ., 389 F.3d 177, 182

(6th Cir. 2004) (quoting Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 885 (6th Cir. 1996))

(alterations in Mitchell). This standard requires more than a de minimis employment action such as

mere inconvenience or a bruised ego. Id. (citing White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d

789, 797 (6th Cir.2004) (en banc); Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th

Cir.2000); Kocsis, 97 F. 3d at 886). An adverse employment action "'constitutes a significant change

in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits.'" White, 364 F.3d at 797-98

(quoting Ellerth, 524 U.S. at 761; citing Kocsis, 97 F.3d at 885-87). Schaber-Goa argues that two

events constitute adverse employment actions (1) a less favorable evaluation and (2) the removal of her

name from a list of interviewees for the hostage negotiation team.

*i. Less favorable evaluation*

A downgraded evaluation is not per se an adverse employment action, rather "the plaintiff must

point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering,

because of the downgraded evaluation." Morris, 201 F.3d at 789 (citing Smart v. Ball State Univ., 89

F.3d 437, 442-43 (7th Cir. 1996); Parrish v. Ford Motor Co., 909 F.2d 1484 (6th Cir. 1990)). The

issue is whether the employee is in danger of suffering a tangible employment action as a result of the

downgraded evaluation. Id. at 789-90. In Morris, the court held that the employee was not subject to

an adverse employment action where the employee's evaluation had been downgraded from "excellent"

to "very good." Id. at 789. The court concluded that this downgrading was not an adverse employment

14

(3:03CV7524)

action because "[i]t is difficult to believe that [the employee] stands in danger of being fired, demoted, or transferred because her supervisor felt she was a 'very good' secretary." Id. at 789-90.

Here, Deputy Warden Jeffreys testified that evaluations "play a key element in promotions." Schaber-Goa's evaluation initially rated her as meeting expectations in all categories.  After she complained of sexual harassment arising from the incidents with Folmar, however, her evaluation was downgraded to "below" expectations in the category of Team Effort/Cooperation.  In Morris, the downgraded evaluation maintained a favorable impression of the plaintiff's work, work remained "very good."  In contrast, Schaber-Goa's downgraded evaluation casts negative aspersions on her ability to work well with others, her performance in that category was below expectations.  Thus, unlike Morris, a reasonable person could conclude that Schaber-Goa's downgraded evaluation could have an adverse impact on future promotions.  It, therefore, is a question of fact whether Schaber-Goa's downgraded evaluation constitutes an adverse employment action.

*ii. Denying interview*

Schaber-Goa also argues that Warden Konteh's removal of her name from the list of interviewees for the hostage negotiation team constituted an adverse employment action.  TCI contends that removing her name from list of interviewees does not constitute an adverse employment action because (1) it merely denied her an interview, not an actual spot on the team, and (2) denying her a spot on the team does not constitute an adverse employment action.  Refusing to hire and failing to promote an individual are clearly adverse employment actions. See White, 364 F.3d at 797-98. Denying an individual the opportunity to participate in a required step in the hiring or promotion

15

(3:03CV7524)

process, therefore, is also an adverse employment action because it operates as a refusal to hire or

failure to promote.  Here, Warden Konteh removed Schaber-Goa's name from the list of interviewees

for the hostage negotiation team.  This removal was tantamount to denying her a position on the team.

Consequently, removing Schaber-Goa's name from the list of interviewees constitutes an adverse

employment action if denying her a position on the team would constitute an adverse employment

action.

TCI contends that denying Schaber-Goa a position on the hostage negotiation team would not

constitute an adverse employment action because it merely amounts to the denial of additional training.

However, the denial of a lateral transfer can constitute an adverse employment action if the position

involves additional benefits or prestige. See Mitchell, 389 F.3d at 183 (non-selection for position of

employment does not constitute adverse employment action "where the sought position is a lateral

transfer, without additional material benefits or prestige").  Deputy Warden Jeffreys testified in his

deposition that it is prestigious to be a member of the hostage negotiation team.  Furthermore, Schaber-

Goa has presented evidence that some members of the hostage negotiation team received overtime

pay.  Thus, it is at least a question of fact whether membership on the hostage negotiation team involved

additional prestige and benefits.  Consequently, it is also a question of fact whether removing Schaber-

Goa's name from list of interviewees constituted an adverse employment action.[4]

*b. Causal Connection*

---

[4]TCI argues that Schaber-Goa performed poorly in the first round of interviews.  This issue, however, affects the damages associated with the retaliation not whether removing her name from the list actually constitutes retaliation.

16

(3:03CV7524)

TCI next argues that Schaber-Goa cannot establish a causal connection between her protected activity and the adverse employment actions. "To prove a causal connection, [a plaintiff] must produce sufficient evidence from which an inference can be drawn that the [employer] took the adverse employment action because [the plaintiff] filed a discrimination charge." Singfield v. Akron Metro. Housing Auth., 389 F.3d 555, 563 (6th Cir. 2004) (citing  EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir.1997)).  "Although no one factor is dispositive in establishing a causal connection, evidence . . . that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir.2000), as quoted in Singfield, 389 F.3d at 563.  In Singfield, the court held that a temporal proximity of just over three months was sufficient evidence of a causal connection to satisfy the plaintiff's prima facie case. 389 F.3d at 563.

Here, Schaber-Goa filed her sexual harassment complaint on September 22, 2001.  Her evaluation was downgraded in November of 2001, or less than two months after her complaint.  This temporal proximity is sufficient to create an issue of fact regarding whether a causal connection exists between Schaber-Goa's complaint and her downgraded evaluation.  Furthermore, Schaber-Goa's name was removed from the list of hostage team negotiators around October 8, 2001, or less than one month after her complaint.  This temporal proximity, therefore, is also sufficient to create an issue of fact regarding whether a causal connection exists between Schaber-Goa's complaint and the removal of her name from the list of interviewees.  Moreover, Captain Harris told Schaber-Goa that her name had been removed from the list of interviewees because of her complaint.  Thus, Schaber-Goa has

17

(3:03CV7524)

presented direct evidence of a causal connection.[5]  Consequently, Schaber-Goa has presented

sufficient evidence to establish her prima facie case of Title VII retaliation and to shift the burden to

TCI.

### 2. Legitimate non-discriminatory reason and pretext

Because Schaber-Goa has established a prima facie case of retaliation, the burden shifts to TCI

to "articulate a legitimate, non-retaliatory explanation for the action." Id. (citing Wrighten v. Metro.

Hosps., Inc., 726 F.2d 1346, 1354 (9th Cir.1984)).  "To satisfy this burden, the [defendant] need only

produce admissible evidence which would allow the trier of fact rationally to conclude that the

employment decision had not been motivated by [retaliatory] animus." Id. (internal quotations omitted)

(quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 257 (1981)).  Here, TCI has not

presented any evidence of a legitimate, non-retaliatory reason for removing Schaber-Goa's name from

the list of interviewees.  TCI, therefore, is not entitled to summary judgment on Schaber-Goa's

retaliation claim.  TCI, however, has proffered evidence that Schaber-Goa's evaluation was

downgraded for non-retaliatory reasons.  The Court, therefore, will continue the analysis regarding this

allegation of retaliation.

TCI contends that Schaber-Goa's evaluation was downgraded due to a complaint from an

inmate's visitor that Schaber-Goa was rude to her.  A reasonable jury could conclude that this

---

[5]TCI contends that Captain Harris's statement is inadmissible hearsay.  Captain Harris,
however, was a member of the interview committee for the hostage negotiation team.  Thus, his
statement would fall within the Fed. R. Eviv. 801(d)(2)(D) hearsay exemption, and, therefore, his
statement is admissible.

18

(3:03CV7524)

complaint provided a non-retaliatory basis for downgrading Schaber-Goa's evaluation.  Thus, TCI has

shifted the burden back to Schaber-Goa to demonstrate that its proffered reason for downgrading her

evaluation was pretextual. See id. at 564.

"A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in

fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant

the challenged conduct." Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir.2000), quoted in

Singfield, 389 F.3d at 564.  Here, Schaber-Goa argues that TCI's proffered reason did not actually

motivate the downgrading of her evaluation.  Deputy Warden Jeffreys testified that after reviewing the

initial evaluation, he concluded that it "wasn't an accurate evaluation for her teamwork and

cooperation." (Jeffreys depo. p. 37.)  So he told Lieutenant Presberry to change her evaluation.

(Jeffreys depo. p. 40.)  Deputy Warden Jeffreys testified that he based his determination that the

evaluation was not accurate based on Schaber-Goa's interactions with him, other officers, and inmates.

(Jeffreys depo. p. 41.)  However, Jeffreys could not recall one other officer or inmate with whom

Schaber-Goa did not get along and indicated that he had no problems with her. (p. 42-43.)  Later,

however, he did testify that, based on the incidents of September 21, 2001, Folmar was one of the

officers with whom Schaber-Goa did not get along. (p.44.)[6]   Thus, the only incidents which Jeffreys

---

[6]This statement is based on Jeffrey's following deposition testimony:

Q        Is Folmar one of officers that Goa didn't get
         along with?

A        As a result of this, I guess not.

19

(3:03CV7524)

identified as reflecting Schaber-Goa's problems with other officers or inmates were the purported

sexual harassment incidents.  Consequently, it is a question of fact whether Schaber-Goa's sexual

harassment complaint was the actual motivation for downgrading her evaluation.  Furthermore,

Schaber-Goa was downgraded in the area of Team Effort/Cooperation.  It is unclear to the Court how

interactions with visitors would be reflected in such a teamwork category.  It, therefore, remains a

question of fact whether a visitor's complaint actually motivated the downgraded evaluation.  Thus,

Schaber-Goa has presented sufficient evidence that TCI's proffered reason for downgrading her

evaluation was pretextual.  Consequently, because TCI has not presented a non-retaliatory reason for

removing Schaber-Goa's name from the list of interviewees and Schaber-Goa has presented sufficient

evidence that TCI's proffered reason for downgrading her evaluation was pretextual, TCI's motion for

summary judgment is denied with respect to Schaber-Goa's retaliation claim.

### V. CONCLUSION

For the foregoing reasons, Defendant Department of Rehabilitation and Correction, Toledo

---

Q    Well, at the time was Folmar one of the officers
     that Goa didn't get along with?

A    No.

TCI argues based on these statements that Jeffreys did not have Schaber-Goa's evaluation
downgraded because of problems with Folmar.  Schaber-Goa draws the exact opposite conclusion.
These statements are ambiguous because of the negative response to a question containing a negative.
It is unclear what Jeffreys' actual intended response was.  A reasonable reviewer of the deposition
transcript, therefore, could draw either conclusion.  Because the Court must draw all inferences in the
light most favorable to the non-moving party for summary judgment purposes, the Court adopts
Schaber-Goa's interpretation.

(3:03CV7524)

Correctional Institution's Motion for Summary Judgment (Doc. No. 28) is GRANTED with respect to

Plaintiff Dawn Schaber-Goa's Title VII hostile work environment sexual harassment claim and

DENIED with respect to her Title VII retaliation claim.

       IT IS SO ORDERED.


  May 23, 2005                                 /s/ David D. Dowd, Jr.          
Date                                        David D. Dowd, Jr.
                                                   U.S. District Judge